**In re HOLLY FARMS CORPORATION SHAREHOLDERS LITIGATION.**

Civ. A. No. 10350.

Court of Chancery of Delaware, New Castle County.

Submitted: May 31, 1989.
Decided: June 14, 1989.

R. Bruce McNew, and Pamela S. Tikellis, Greenfield & Chimicles, Wilmington, and Jules Brody, Stull, Stull & Brody, New York City, Joseph A. Rosenthal, and Norman M. Monhait, Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, for Shareholder plaintiffs.

Rodman Ward, Jr., Anthony W. Clark, Keith R. Sattesahn, and Andre G. Bouchard, Skadden, Arps, Slate, Meagher &

Flom, Wilmington, George A. Zimmerman, Jonathan J. Lerner, and Marco Schnabl, Skadden, Arps, Slate, Meagher & Flom, New York City, for Tyson Foods, Inc. and Holly Acquisition Corp., and James Blair, Gen. Counsel for Tyson Foods.

Kenneth J. Nachbar, and Lawrence A. Hamermesh, Morris, Nichols, Arsht & Tunnell, Wilmington, and Steven M. Barna, and Paul Vizcarrondo, Jr., Wachtell, Lipton, Rosen & Katz, New York City, for defendants Holly Farms Corp. and its directors.

R. Franklin Balotti, and Samuel A. Nolen, Richards, Layton & Finger, Wilmington, and Gregory P. Joseph, Fried, Frank, Harris, Shriver & Jacobson, New York City, and Bruce C. Rohde, Leo A. Knowles, and John E. North, McGrath, North, Mullin & Kratz, Omaha, Neb., for ConAgra, Inc. and CAG Acquisition Corp.

HARTNETT, Vice Chancellor.

This is another chapter in the protracted litigation arising from the on-going competing offers for the stock of Holly Farms Corporation ("Holly Farms" or "Holly") by Tyson Foods, Inc. and ConAgra, Inc. One of the bidders, Tyson Foods, Inc. and its Holly Acquisition Corp. (collectively "Tyson" or "Tyson Foods") has moved for a preliminary injunction preventing Holly Farms and its directors, and the other bidder, ConAgra, Inc. and its CAG Acquisition Corp. (collectively "ConAgra") from taking any steps to effectuate a second merger agreement entered into between ConAgra and Holly Farms on May 20, 1989. Tyson has also moved for a preliminary injunction mandatorily requiring Holly Farms to redeem a Shareholders Rights Plan ("poison pill") adopted some time ago.

I find that although the directors of Holly Farms have consistently favored ConAgra in the bidding between ConAgra and Tyson Foods for Holly Farms, their acceptance of ConAgra's latest proposal on May 20, 1989 was in the best interests of the shareholders of Holly Farms and, therefore, no injunction to prevent its effectuation should be entered despite the unfairness of the bidding process to Tyson.

I also find that the existence of the Holly Farms poison pill is presently enhancing a legitimate interest of the shareholders of Holly Farms in that it encourages a non-coercive stockholder vote on the ConAgra proposal and therefore its redemption should not be mandated at this time.

I

Many of the facts underlying this extended battle between Tyson Foods and ConAgra for control of Holly Farms have been set forth in three previous opinions in this action: *In re HOLLY FARMS CORPORATION Shareholders Litigation*, Del. Ch., C.A. 10350–NC, Hartnett, V.C., 1988 WL 143010 (Dec. 30, 1988); *In re HOLLY FARMS CORPORATION Shareholders Litigation*, Del. Ch., C.A. 10350–NC, Hartnett, V.C., 1989 WL 25810 (March 22, 1989); and *In re HOLLY FARMS CORPORATION Shareholders Litigation*, Del. Ch., C.A. 10350–NC, Hartnett, V.C., 1989 WL 60502 (May 19, 1989). Therefore, to the extent possible, the recitation of the facts is limited to those events occurring after my May 19, 1989 Opinion which denied Tyson Foods' then existing motions.

In my May 19, 1989 Opinion, I denied Tyson Foods's motion to enjoin a proposed May 19–21 auction on the grounds that Tyson had not shown that it would suffer true irreparable harm if the auction took place and, in any case, under the facts presented, the controversy was not ripe for a judicial determination. I did note, however, that Holly Farms' guidelines for the proposed auction, as then stated, substantively favored ConAgra in the bidding process. I also denied Holly Farms' motion to prospectively block any Tyson–ConAgra settlement agreement, as I found there was no legal basis to grant the requested relief.

Within hours of the May 17 hearing on these motions, and prior to the release of my Opinion on May 19, Holly Farms sent Tyson yet another set of auction guidelines ("the revised guidelines"). These revised guidelines were designed to partially replace, and partially augment, the original guidelines provided to Tyson Foods and

ConAgra on May 12th. The text of the original guidelines was set forth in my May 19, 1989 Opinion.

The revised guidelines stated:

To facilitate the preparation of your bid for Holly Farms pursuant to the auction guidelines included in our counsel's letter of May 12, to your counsel, I am writing on behalf of the Board of Directors to advise you as follows:

1. Written proposals should be submitted to Holly Farms' Board of Directors, with copies to Morgan Stanley and Wachtell Lipton, by 5:00 p.m., Eastern time, on Friday, May 19. The proposals should be submitted on a sealed basis. Holly Farms' Board is scheduled to meet at 12:00 noon, Eastern time, Saturday, May 20, at the offices of Wachtell Lipton in New York to consider and act upon any proposals received.

2. The price bid by any bidder must be a specific number, formula or exchange ratio, and may not be formulated solely by reference to the price bid by the other bidder (e.g., $.25 per share more than the other bidder's proposed price).

3. The purpose of the auction is to obtain each bidder's best and highest bid and to conclude finally the contest for control of Holly Farms. Bidders should assume that there will not be a second round of bidding, and that there will be no opportunity in the auction process to submit an improved bid. A bidder that fails to submit its highest and best bid risks losing its opportunity to acquire Holly Farms. The Board has no interest in pursuing a process consisting of a series of bids, each exceeding by a nominal amount the previous bid received by the Board. However, depending on the circumstances, the Board may wish to disclose the terms of one bidder's bid to the other bidder in order to reach a conclusive result. Accordingly, the Board is not prepared to commit that it will honor "no shop" provisions contained in a bid. If the Board engages in a "shopping" process, both bidders will be so informed and will be treated in the same manner.

4. The Board views its unwillingness to be bound by "no shop" provisions and its willingness to grant a reasonable "topping fee" to the winning bidder as a means to encouraging each bidder to submit its highest and best bid and insuring the Board's ability to conclude finally the contest for control of Holly Farms. Assuming that the winning bid substantially exceeds Tyson's pending $63.50 offer, a topping fee in an amount up to $25 million may be granted. Such a topping fee would be available to whichever bidder submits the highest bid in the auction process. Under no circumstances will the Board consider granting any asset or stock option in the auction process. The form of the topping fee provision will be substantially as described in the May 12 auction guidelines.

5. The form of the "fiduciary out" termination provision will also be provided to each bidder.

6. Any determination by the Board to redeem Holly Farms Share Purchase Rights will be made by the Board in accordance with its fiduciary duties and in light of all the circumstances existing at the time such a determination is made.

The most significant difference between the two sets of guidelines was that the revised guidelines removed as a prerequisite to the pending auction the settlement of the dispute between Holly Farms and ConAgra as to the validity of a lock-up option provision agreed to by Holly Farms and ConAgra on November 16, 1988. In my May 19th Opinion, I pointed out that the provision in the guidelines whereby Tyson Foods would essentially bear the cost of any negotiated settlement removing the option provision entered into between Holly Farms and ConAgra, clearly favored ConAgra in the bidding process.

II

It seems clear that the existence of the November 16, 1988 lock-up option granted to ConAgra by the directors of Holly Farms has been the major impediment to an open, fair and even-handed auction. Nevertheless, despite the Holly Farms di-

rector's earlier acknowledgement that resolution of the lock-up impasse was a prerequisite to forcing Tyson Foods and ConAgra to submit their "highest and best" bids, the directors determined to forge ahead with an auction on the weekend of May 19–20, 1989, without any further effort to remove it. The revised guidelines were silent as to whether a revised offer by Tyson Foods could be conditioned upon the elimination of, or a judicial invalidation of, the lock-up.

During the hours preceding a 5:00 p.m. Friday May 19th bidding deadline, Tyson Foods and ConAgra, the only competing bidders for Holly Farms, were engaged in last minute discussions designed at achieving a negotiated removal of the lock-up in consideration of a substantial payment to ConAgra by Tyson. Tyson certainly favored such a course, as a separate settlement with ConAgra would preclude another round of bidding and virtually ensure the successful completion of its outstanding $63.50 cash Tender Offer. Holly Farms suggests that had Tyson Foods and ConAgra reached a negotiated settlement, Tyson Foods would have been in a position to lower the cash consideration offered for Holly Farms' shares as a November 11, 1988 standstill agreement between Holly Farms and Tyson Foods, mandating a minimum bid, had not been amended upwards to $63.50. Certainly if a settlement between Tyson Foods and ConAgra had come to fruition there would have been no impediment to Tyson completing its pending all-cash Tender Offer at $63.50.

In any event, the negotiations broke down just prior to the 5:00 p.m. deadline, at which time ConAgra began telecopying an improved offer proposing a merger whereby the stockholders of Holly Farms would receive 2.1 ConAgra shares for each of their shares. ConAgra's earlier November 1988 proposal, which was approved by the Board but rejected by Holly Farms' shareholders, had essentially provided for a merger at 1.875 shares of ConAgra for each Holly Farms' share. The transmission from ConAgra, however, was abruptly halted at 5:05 p.m. when representatives of Tyson Foods called ConAgra and reopened the settlement negotiations and

then agreed in principle to accept ConAgra's price to settle the matter.

Thereafter, at approximately 6:00 p.m., Holly Farms received a letter from Tyson Foods stating that ConAgra had indicated a willingness to settle its claims and, accordingly all the principal parties should meet to finalize an arrangement which would allow Tyson to "proceed expeditiously" with its $63.50 cash Tender Offer. ConAgra then sent word to Holly Farms that its aborted partially transmitted proposal was officially withdrawn.

The record indicates that Tyson Foods and ConAgra had tentatively agreed that Tyson would pay ConAgra $50 million to release its rights under the November 1988 Merger Agreement and lock-up option. However, as fate would have it, the settlement quickly fell apart over certain legal issues of indemnification which arose because of the partial transmission of the then aborted improved ConAgra offer. At approximately 6:30 p.m., ConAgra again began a transmission of its 33–page proposal and proposed Merger Agreement. Contrary to certain statements appearing in the financial press, the record indicates that ConAgra had been considering an improved offer at a 2.1 to 1 exchange ratio since the latter part of April.

At around 7:30 p.m. on Friday, May 19th, Holly Farms' counsel informed Tyson Foods' counsel that ConAgra had submitted an improved offer and urged Tyson to respond with an improved offer by noon the following day. It was explicitly stated, however, that the Board of Holly Farms would *not* be prepared to accept a conditional bid from Tyson Foods. Mr. Thomas N. Urban, an independent director of Holly Farms, has explained by affidavit that the Board wanted only to consider offers with "deliverable value" and that the Board did not want to again be placed in the position of having to reject a higher bid because the transaction it contemplated could not be completed on a timely basis. No further communications were exchanged on Friday.

Tyson Foods' response to the news of ConAgra's improved offer reached Holly

Farms just prior to the Board meeting at noon on Saturday. Instead of submitting an improved unconditional bid as the Holly Farms' Board had hoped, the six-page letter of Tyson lectured the Board on its purported violations of Delaware law, reiterated Tyson's position that it would absolutely not participate in a patently unfair and flawed auction process and again urged the Holly Farms' Board to engage in a negotiated solution that "would serve the best interests of Holly's shareholders". James B. Blair, Tyson Foods' General Counsel, in an affidavit, has stated that the Tyson Foods' team disbanded at this point in the belief that Holly Farms had no *bona fide* intention to afford Tyson Foods a fair opportunity to acquire the company. It was apparently the consensus of the Tyson team that Holly Farms insistence on an unconditional bid had foreclosed any further action by Tyson Foods. Tyson's representatives, however, did not notify Holly Farms of their leaving their attorney's office.

### III

The first order of business at the noon Saturday meeting of the Holly Farms' Board was a review and analysis of the revised ConAgra proposal.

Pursuant to this proposal, ConAgra offered to exchange 2.1 shares of its common stock for each share of stock of Holly Farms. ConAgra claimed that the value of its proposal was equal to approximately $74.81 per Holly Farms' share based upon ConAgra's May 19, 1989 closing stock price.

The proposed Merger Agreement also provided for a $15 million bust-up fee in the event of a topping bid from any other suitor and for expense reimbursement of up to $10 million if ConAgra's offer was not completed. As specified in the guidelines, the proposed Merger Agreement also contained a fiduciary-out provision although the existing November 16, 1988 lock-up option did *not*. The proposed agreement also left in place the provisions of the November 16 lock-up option. ConAgra expressly conditioned its proposal on the Holly Farms directors' acceptance of the terms and form of the proposed Merger Agreement prior to the opening of business on Monday, May 22, 1989.

In its presentation to the Board, Morgan Stanley & Co. Incorporated, the Board's financial advisor, opined that ConAgra's proposal had a conservative discounted value in the $66 to $67 per share range which was $2.50 to $3.50 greater than Tyson's cash offer on a non-discounted basis which was, however, conditioned on elimination of the lock-up option. It also advised that the proposed termination and expense reimbursement provisions, which amount to approximately $1.50 per Holly Farms' share, appeared reasonable and were commensurate with similar fees paid in analogous transactions. Although the termination fee proposed by ConAgra was not precisely in the same form as a "topping fee" specified in the revised guidelines, Morgan Stanley felt that "in almost all situations in which any such fee could reasonably be expected to be payable, the two provisions, despite their formal difference, both result in payment of the fee." Notwithstanding the purported reasonableness of these fee provisions, the Board instructed its counsel to contact ConAgra in an effort to seek reductions in their amounts.

At approximately 2:30 p.m. on Saturday, Holly Farms telecopied to Tyson Foods' counsel, Michael Schell of Skadden, Arps, Slate, Meagher & Flom, a response to Tyson's noon diatribe. In this letter the Holly Farms' directors indicated for the first time that they would be willing to entertain a conditional offer by Tyson Foods in order to determine whether Tyson was willing to compete on economic terms. The letter further stated that if a competitive offer was forthcoming from Tyson, Holly Farms would agree to meet with all the interested parties in an effort "to seek a final resolution of the situation". Although Tyson Foods would, in reality, be bidding only for a meeting that *might* eventually lead to an acquisition of Holly Farms, this communication reflected a marked change in Holly

Farms' attitude with regards to a negotiated solution.

Unfortunately, the telecopied letter did not immediately reach the waiting hands of Mr. Schell, who apparently had left his office to attend a wedding once the Tyson Foods' team had disbanded. It seems that another Skadden Arps attorney, Margaret Wolff, came upon the letter only by chance approximately two hours after it was received at the office of Skadden Arps. This sad scenario was compounded by Holly Farms counsel Wachtel, Lipton, Rosen & Katz's failure to alert Skadden Arps to the transmittal of this letter. After speaking to Mr. Blair around 5:00 p.m., Ms. Wolff attempted to contact the rest of the members of the Tyson Foods team.

In the meantime, the Holly Farms' Board was rebuffed by ConAgra in its efforts to achieve a reduction in the termination fee and expense reimbursement provisions or to convince ConAgra to agree to a topping fee in the form set forth in the guidelines. At approximately 5:40 p.m. the Holly Board sent yet another letter to Tyson Foods asking whether it would be submitting an improved bid.

At approximately 6:40 p.m. Ms. Wolff, on behalf of Tyson Foods, replied that she was trying to reassemble the Tyson team and that they might be able to give Holly Farms a preliminary response later that evening or Sunday morning. Shortly thereafter, the Board set 10:00 p.m. Saturday evening as a final bidding deadline.

Following a telephone conference call with the Tyson representatives, Mr. Blair, Mr. Schell and Don Tyson, and a later conversation with Warren Stephens, Tyson's financial advisor, Ms. Wolff drafted a general written response to Holly Farms.

Ms. Wolff first reiterated the fact that it would be impossible for the Tyson Foods' team to wholly reassemble before the 10:00 p.m. deadline, but she felt Tyson Foods could provide a more meaningful response the following day—Sunday, May 21st. While stressing that it was impossible for her to determine what the operative bidding rules were, she again declared that Tyson Foods would gladly participate in any fair auction process and would be prepared to meet with all the interested parties, as suggested by Mr. Taylor of Holly Farms, to arrive at an overall solution "as early as Monday morning, May 22". She specifically asked the Board not to take any unilateral irrevocable action that would shut Tyson Foods out of the process.

In closing, Ms. Wolff again voiced Tyson's concerns as to the lingering effects of the option lock-up agreement and inquired as to whether the Holly Farms' Board would authorize a conditional contract with Tyson Foods in the event it outbid ConAgra and, if so, how Holly Farms proposed to eliminate the lock-up to place Tyson in a position to actually acquire Holly Farms. There were no further communications between the parties on Saturday night.

After receiving what they considered to be an unsatisfactory reply from Ms. Wolff, the directors proceeded to unanimously approve the ConAgra proposal and the new Merger Agreement was signed by R. Lee Taylor, II, the President of Holly Farms, on Saturday evening. They did so despite the fact that ConAgra had not required a response to its proposal until *Monday* morning.

According to an affidavit of Mr. Urban, the Holly Farms Board was convinced that Tyson Foods was not planning to submit a higher bid and the directors feared that any delay in approving ConAgra's superior economic proposal risked losing it because it feared that ConAgra and Tyson would reach a collusive settlement and, as a consequence, ConAgra's improved offer would be withdrawn. Accordingly, Mr. Urban asserts that the Holly Farms's Board determined, in its business judgment, that the risk of losing the ConAgra bid to a collusive settlement significantly outweighed any concerns as to impediments facing Tyson if it later decided to submit an improved bid.

It is undisputed that Tyson Foods did not submit any new or improved proposal prior to learning of the Board's acceptance of the ConAgra proposal on Sunday afternoon, nor has Tyson since then made any improved bid or committed itself to do so.

## IV

"To obtain a preliminary injunction the plaintiff must demonstrate a reasonable probability of success on the merits and that irreparable harm will occur absent the injunction. Additionally, the plaintiff must show that the harm it would suffer absent an injunction outweighs the harm to the defendant if relief is granted. *Ivanhoe Partners v. Newmont Mining Corp.*, Del. Supr., 535 A.2d 1334, 1341 (1987); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173, 179 (1986); *Gimbel v. Signal Companies, Inc.*, Del. Ch., 316 A.2d 599, 602, *aff'd.*, Del.Supr., 316 A.2d 619 (1974)." *Allen v. Prime Computer, Inc.*, Del.Supr., 540 A.2d 417, 419 (1988).

"An application for a preliminary injunction is addressed to the sound discretion of the court, to be guided according to the circumstances of the particular case ... Substantial and positive injury must always be made to appear to the satisfaction of a court of equity before it will grant an injunction ... An injunction, being the 'strong arm of equity' should never be granted except in a clear case of irreparable injury, and with full conviction on the part of the court of its urgent necessity." *Gimbel v. Signal Companies, Inc.*, 316 A.2d at 602. See also *Bayard v. Martin*, Del.Supr., 101 A.2d 329 (1953), *cert. den.*, 347 U.S. 944, 74 S.Ct. 639, 98 L.Ed. 1092 (1954); *Consolidated Fisheries Co. v. Consolidated Solubles Co.*, Del.Supr., 99 A.2d 253 (1953).

The Court of Chancery has historically been vested with considerable discretion in delicately balancing all the equities and, although some might desire a more definite standard, no hard and fast rule is likely or desirable which will apply to all factual circumstances. Cf. *Eastern Shore Natural Gas Co. v. Stauffer Chemical Co.*, Del.Supr., 298 A.2d 322 (1972); *Data Gen. Corp. v. Digital Computer Controls, Inc.*, Del.Supr., 297 A.2d 437 (1972); *Thomas C. Marshall, Inc. v. Holiday Inn, Inc.*, Del. Ch., 174 A.2d 27 (1961); *Hollingsworth v. Szczesiak*, Del. Ch., 84 A.2d 816 (1951). See also Note, *Preliminary Injunctions in Delaware: The Need for a Clearer Standard*, 13 Del.J.Corp.L. 107 (1988).

Where a preliminary mandatory injunction is sought, it will not be issued unless the legal right to be protected is clearly established. *Steiner v. Simmons*, Del. Supr., 111 A.2d 574 (1955).

## V

The Delaware Supreme Court in *Mills Acquisition Co. v. Macmillan, Inc.*, Del.Supr., 559 A.2d 1261, Moore, J. (1989) ("*Macmillan*"), has recently set forth the procedure to be followed by this Court when it reviews an attempt by a board to sell the corporation. Any challenged auction of a corporation must receive heightened judicial scrutiny to determine if the board, in conducting the auction for the control of the corporation, took care to assure "the most scrupulous adherence to ordinary principles of fairness in the sense that stockholder interests are enhanced rather than diminished." *Macmillan* at 1285.

From a review of the mostly uncontroverted facts surrounding the auction conducted over the May 19–21 weekend, I find that Tyson Foods has borne its *Macmillan* burden of showing that the directors of Holly Farms, the target company, treated it on unequal terms *vis a vis* its competitor, ConAgra, in the bidding for control of Holly Farms. *Macmillan* at 1288. As discussed in the prior opinions in this case, the directors of Holly Farms have consistently favored ConAgra as a suitor, apparently because they favor ConAgra's plan to continue to operate Holly Farms as a separate entity.

Tyson Foods on May 19–21 was again not treated equally with ConAgra because it was not given a fair opportunity to submit a bid free of the ConAgra lock-up option or to submit a bid contingent upon the lock-up being removed prior to closing. Only on Saturday, May 20, was Tyson Foods suddenly advised it would be permitted to submit a contingent bid. And if it then bid a price higher than the best bid of ConAgra, it would have been given a conference, although ConAgra was offered the

Company if it were the high bidder. Tyson Foods was also given only a few hours to prepare and submit a contingent bid after being told on several occasions that no contingent bid would be acceptable.

Under *Macmillan* the existence of unequal or unfair treatment of one bidder over another, however, does not end this Court's inquiry. In order to set aside an agreement providing for the sale of the control of a corporation, this Court must also "examine whether the directors properly perceived that the shareholder interests were enhanced." *Macmillan* 559 A.2d 1288.

Significantly, while this may be a departure from the historical role of Chancery, it is the interests of the Holly Farms' shareholders which must be primarily considered, not the interests of the bidder.

I therefore find from the present record that it is reasonably probable that the directors of Holly Farms had a justifiable reason to believe on Saturday evening that a deal between the only two bidders— Tyson Foods and ConAgra—could occur at any moment and that if it did occur ConAgra would withdraw its latest offer worth approximately $66 to $67 per share and the shareholders of Holly Farms would be left with the bid of Tyson Foods of $63.50 per share for a loss of at least $2.50 per share. It is conceded by all that there are no other likely bidders for Holly Farms.

The spectre of a Tyson Foods–ConAgra settlement was a clear and present danger to the shareholders of Holly Farms as is evidenced by the now known fact that at 5:05 p.m. on the preceding day Tyson Foods and ConAgra had agreed to settle on a basis whereby the stockholders of Holly Farms would receive only $63.50 per share. This deal fell through because by 5:05 p.m. ConAgra had commenced to transmit its new bid which raised the danger of massive legal liability if that offer were withdrawn due to collusion between ConAgra and Tyson Foods.

Faced with this threat, the Holly Farms directors' action in accepting the significantly higher ConAgra offer before it could be withdrawn seems to have been "reasonable in relation to the advantage sought to be achieved, or conversely, to the threat which a particular bid allegedly poses to stockholder interests." *Macmillan* 559 A.2d 1288.

It therefore seems reasonably probable that "the directors' actions necessarily are entitled to the protections of the business judgment rule" and "there is no further judicial inquiry into the matter." *Macmillan* 559 A.2d 1288.

Tyson Foods, therefore, has not borne its burden of showing that it has a reasonable probability of ultimate success on the merits.

## VI

As previously discussed, in order to obtain a preliminary injunction Tyson Foods must also show that if an injunction is not granted it will suffer irreparable harm. This it has not done.

If an injunction is not granted the proposed merger between Holly Farms and ConAgra must still be approved by a two-thirds affirmative vote of the Holly Farms' stockholders, pursuant to the requirements of Holly Farms' Certificate of Incorporation.

The ConAgra stock swap merger proposal at the time it was made had a discounted estimated value of $66–$67 per Holly Farms share. This, however, is subject to change because the value is predicated on the market value of ConAgra shares. By the time of the stockholder vote, the value of ConAgra's offer may not be significantly higher than the $63.50 cash offer of Tyson Foods. Also, as discussed in my March 22 opinion, there are various other economic or personal reasons why some shareholders of Holly Farms might prefer the existing offer of Tyson Foods over the offer of ConAgra despite the present higher economic value of the ConAgra offer. Tyson Foods is also free to make a new enhanced offer which might be accepted by the stockholders of Holly Farms. The outcome of the shareholder vote is, therefore, speculative and if the ConAgra offer is

rejected Tyson Foods will not suffer any harm.

One possible real impediment to Tyson Foods making an enhanced offer is the existence of the lock-up option in the November 16 Merger Agreement which gives ConAgra the option to purchase a significant portion of the assets of Holly Farms. Unfortunately this agreement does not contain a "fiduciary out" provision which would permit Holly Farms to terminate the agreement in the face of a better offer. The existence of this lock-up option, although previously found by me to be reasonably probable to be unenforceable, has hung as a shroud over the bidding process, favoring ConAgra and disfavoring Tyson Foods. There also does not seem to be any way to definitively end its negative influence on the bidding process in any reasonable time period.

Although its existence has a negative impact on Tyson Foods ability to bid agressively, I am not convinced that it absolutely prohibits Tyson Foods from increasing its offer. And, in any case, if its existence is found to have caused financial harm to Tyson or to the stockholders of Holly Farms (which includes Tyson), then the remedy of money damages is ultimately available against Holly Farms and its directors—and perhaps others.

I, therefore, find that Tyson Foods has also not borne its burden of showing that it will suffer irreparable harm if a preliminary injunction enjoining enforcement of the new Merger Agreement is not granted.

## VII

■ Even if Tyson Foods has shown a reasonable probability of success on the merits and that irreparable harm will occur absent an injunction (which it has not), in order to obtain a preliminary injunction it must also show that the harm it will suffer if the injunction is not granted outweighs the harm to the stockholders of Holly Farms if relief is granted.

As indicated above, Tyson Foods may suffer no harm and, if it does, it likely has an adequate remedy for damages.

If, however, Tyson Foods is granted its request for a preliminary injunction enjoining the vote of the stockholders until the issue of the invalidity of the lock-up option is definitively determined, many months are likely to pass before there can be a trial in this Court on the validity of the lock-up option, a decision by this Court, and then a possible appeal and appellate decision. If the value of money is considered, the stockholders of Holly Farms will lose approximately $1 per share for each month they are prevented from receiving payment for their shares. This is a loss for which there will likely be no remedy.

The value of the shares of a corporation is best determined by the marketplace and if tender offers are to serve their supposed purpose of enhancing stockholder value they must proceed expeditiously to a reasonably prompt conclusion. A trial in the midst of an on-going tender offer is likely to impede the market from being able to promptly ascertain the value of the sought shares. It might also often turn out to be a useless exercise in the face of a constantly changing bidding environment.

In balancing all the equities present, therefore, I find that the best interest of the stockholders of Holly Farms mandates that a shareholder vote be permitted to occur as soon as practicable so that the stockholders may choose between the competing offers.

## VIII

■ Tyson Foods also seeks a preliminary mandatory injunction compelling the redemption of the existing Shareholders Rights Plan ("poison pill") of Holly Farms. As previously stated, because a mandatory injunction is sought, Tyson must clearly establish its legal right to it.

While it might be tempting to direct the directors of Holly Farms to redeem the poison pill now in view of its impediment to Tyson Foods, to do so, however, under the unusual circumstances present, would not enhance the best interests of the shareholders of Holly Farms.

Tyson argues that the bidding is at an "endstage" and, at this point, the pill

serves no purpose other than to block shareholder choice with regards to Tyson's $63.50 cash tender offer. See *Mills Acquisition Co. v. Macmillan, Inc.*, Del. Ch., C.A. No. 10168, Jacobs, V.C., 1988 WL 108332 (Oct. 18, 1988), *rev'd on other grounds, Macmillan*, supra; *City Capital Assoc., L.P. v. Interco Corp.*, Del. Ch., 551 A.2d 787 (1988).

Holly Farms, on the other hand, argues that a Board's decision whether or not to maintain the rights plan is protected by the business judgment rule—see, e.g., *Grand Metropolitan PLC v. Pillsbury Co.*, Del. Ch., C.A. No. 10319, Duffy, Act. Ch., 1988 WL 119402 (Nov. 7, 1989); *Nomad Acquisition Corp. v. Damon Corp.*, Del. Ch., C.A. No. 10189, Hartnett, V.C., 1988 WL 96192 (Sept. 20, 1988)—and since its Board determined, in its business judgment, that maintenance of the poison pill is the only way to allow the Holly Farms shareholders a meaningful vote on ConAgra's economically superior proposal, the poison pill must remain in place.

Although the record does not indicate that the directors have considered the question of whether the poison pill should continue in place after the new developments, under the unique factual circumstances of this case, I decline to order a redemption of the poison pill, at this time, because I find that it continues to serve a legitimate stockholder interest in maximizing the value of Holly Farms for its shareholders. *Macmillan*, supra.

The May 20 Merger Agreement between ConAgra and Holly Farms is conditioned upon an affirmative vote by two-thirds of Holly Farms' outstanding shares and, therefore, as a practical matter, Tyson could effectively block shareholder approval of the Holly Farms–ConAgra Merger Agreement by acquiring, or otherwise gaining control of an additional 20% of Holly Farms' outstanding shares. This 20% estimate takes into account Tyson's approximately 3% present ownership interest in Holly Farms and the fact that about 10% of the shares will likely not vote. While I recognize that a November 11, 1988 Confidentiality Agreement exists between Tyson Foods and Holly Farms, I am not convinced that its provisions totally prohibit Tyson Foods from now acquiring an additional 20% of Holly Farms shares.

I further recognize that there is no real dispute as to the present economic superiority of ConAgra's offer. The ConAgra proposal has been valued on a fully discounted basis at approximately $66–$67 per Holly Farms share, while Tyson's cash offer remains $63.50 on an undiscounted basis. It also seems likely that the discounted value of Tyson's offer is significantly less than $63.50. At oral argument, it was asserted that the time value of money alone reduces the value of both offers by approximately $1 per share for each month's delay in closing of the offer. Likewise, the uncertainty surrounding the lock-up contingency necessarily impacts negatively the Tyson Foods' offer.

It appears, therefore, that, if the poison pill is redeemed now, Tyson might be in a position to block approval of ConAgra's economically superior offer, leaving Holly Farms' public shareholders with no alternative other than to accept Tyson's presently economically inferior $63.50 offer. The financial interests of the shareholders of Holly Farms, therefore, are best preserved by leaving the poison pill in place for the present.

I am also not convinced that the bidding process is necessarily at an endstage. The record indicates that Tyson may have the wherewithal to make an improved bid for Holly Farms. Don Tyson stated as much in his March 5, 1989 deposition when he stated that Tyson has not yet made its highest offer. The present maintenance of the poison pill, therefore, rather than restricting shareholder choice, tends to promote a continuation of the competitive bidding process.

In sum, I find that the Board's decision not to redeem the poison pill meets the enhanced standards of *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985), and I therefore find that there is a reasonable probability that it is protected by the business judgment rule. Under the circumstances, maintenance of the pill

is a reasonable response to the threat posed by Tyson's possible blockage of a meaningful shareholder vote on the Merger Agreement. *Macmillan,* 559 A.2d 1288. Until such time as Tyson's offer becomes competitive with the ConAgra proposal, the poison pill, therefore, continues to serve a valid purpose. See *Grand Metropolitan PLC v. Pillsbury Co.,* supra.

Needless to say, if the shareholders reject the ConAgra merger proposal, thereby, in effect, expressing a preference for the offer of Tyson Foods, it would seem likely that the directors of Holly Farms should then fulfill their fiduciary duties, which they so proudly proclaim, and redeem the poison pill so that at long last Tyson could complete its tender offer.

### IX

In conclusion, after attempting to follow the procedures set forth in *Macmillan,* I conclude that, notwithstanding the unequal treatment received by Tyson Foods, one of the two bidders for Holly Farms, it is in the best economic interests of the shareholders of Holly Farms that a preliminary injunction not be entered enjoining effectuation of the May 20, 1989 Holly Farms–ConAgra Merger Agreement or the shareholders meeting to be called to consider it.

I also find that the existence of the Stockholder Rights Plan ("poison pill") of Holly Farms is still enhancing legitimate shareholder interests by contributing to a non-coercive vote of the stockholders of Holly Farms and, therefore, should not be redeemed at this time.

The application of Tyson Foods for preliminary injunctive relief is therefore denied.

IT IS SO ORDERED.