**HOLLY FARMS CORPORATION, a Delaware corporation, Plaintiff,**

v.

**R. Lee TAYLOR, II, individually and as a class representative for the participants in the Holly Farms Restricted Stock Long–Term Performance Bonus Plan, Defendant.**

Civ. A. No. 89–466–CMW.

United States District Court, D. Delaware.

Oct. 11, 1989.

Anthony W. Clark, and Randall S. Thomas, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del. (C. Joseph Giroir, Jr., of Giroir & Gregory, Little Rock, Ark., of counsel), for plaintiff.

R. Franklin Balotti, William J. Wade, and Gregory V. Varallo, of Richards, Layton & Finger, Wilmington, Del. (Shaw, Pittman, Potts & Trowbridge, Washington, D.C., of counsel), for defendant.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

The defendant, R. Lee Taylor, II, filed a notice of removal[1] to this Court on August 29, 1989. By this petition, Taylor sought to remove, from the Delaware Court of Chancery (the "Delaware court") to this Court, an action (the "Delaware state action") that plaintiff Holly Farms Corporation ("Holly Farms") had filed on August 18, 1989. Holly Farms, a Delaware corporation, filed the Delaware state action against Taylor individually and as a class representative for the participants in the Holly Farms Restricted Stock Long–Term Bonus Plan (the "stock bonus plan"). In response to Taylor's petition for removal, Holly Farms filed a motion to remand on August 31, 1989.

Defendant Taylor, admittedly a citizen of the State of Tennessee, alleges that Holly Farms' principal place of business changed from Memphis, Tennessee to Springdale, Arkansas after the acquisition of Holly Farms by Tyson Foods, Inc. ("Tyson Foods") under a merger agreement dated June 23, 1989. On this basis, therefore, the defendant asserts that this federal court has subject matter jurisdiction of the Delaware state action pursuant to 28 U.S.C. §§ 1332(a) and 1441(a), by virtue of the parties' diversity of citizenship. Plaintiff

1. The terms "notice of removal" and "petition for removal" shall be used interchangeably throughout this Opinion.

Holly Farms vigorously denies that the Tyson Foods' acquisition affected its principal place of business under 28 U.S.C. § 1332(c).

Defendant also filed a motion to dismiss, or alternatively, to transfer or stay proceedings on September 12, 1989.

It is necessary to determine whether the Delaware state action can be properly removed to this federal court. This determination specifically requires the court to ascertain whether Holly Farms' principal place of business was altered by the Tyson Foods' acquisition of Holly Farms.

For the reasons which will be stated herein, the defendant's petition for removal is denied and the plaintiff's motion to remand is granted. Consequently, the Court finds it unnecessary to address defendant's motion to dismiss, or alternatively, to transfer or stay proceedings.

## I. FACTS

The present dispute arrived at this Court after a long and bitter corporate takeover battle waged in the Delaware Court of Chancery for control of Holly Farms. Tyson Foods sought, in the fall of 1988, to gain control of Holly Farms. A Tyson Foods' takeover bid for Holly Farms encountered fierce resistance from defendant Taylor, the former Holly Board, and ConAgra, Inc., the favored bidder of Taylor and the former Holly management. The Delaware court issued a series of decisions relating to the struggle between Tyson Foods and ConAgra for control of Holly Farms.[2]

Ultimately, Tyson Foods prevailed in its quest for control of Holly Farms. The final result of the litigation in the Delaware court was the merger agreement of June 23, 1989. According to the terms of the merger agreement, Tyson Foods and its wholly-owned subsidiary, Holly Acquisition Corporation ("HAC"), agreed to acquire all outstanding stock of Holly Farms in a tender offer (the "tender offer") and merg-

er (the "merger") at $70 per share. Tyson Foods further agreed to cause Holly Farms to perform its obligations under the stock bonus plan according to its terms. As provided by the merger agreement, HAC acquired 97% of the common stock of Holly Farms pursuant to the tender offer on July 18, 1989. In addition, on August 9, 1989, HAC merged into Holly Farms and Tyson Foods obtained the remaining 3% of the Holly Farms stock. Thus, Holly Farms, the surviving corporation, became a wholly-owned subsidiary of Tyson Foods.

Holly Farms has been and remains a holding company for its numerous divisions and subsidiaries located across the United States. Holly Farms and its subsidiaries and divisions are engaged in the business of producing and marketing chickens and chicken products. It is undisputed that, prior to the execution of the merger agreement, Holly Farms' principal place of business was Memphis, Tennessee.

Holly Farms conducts most of its activities through its wholly-owned subsidiaries. Prior to the merger agreement, Holly Farms employed about 15 people at its principal place of business in Memphis. The employees at the Memphis office included defendant Taylor as chief executive officer, Ted Bailey, Elbert Thomas, Jr., John Stout, Sr., as Vice–Presidents, James Thompson as Secretary and Treasurer, and a small number of support staff.[3] Its major assets were and are the stock of its operating subsidiaries, which are viable operating companies employing more than 16,000 people and real estate in Memphis valued at several millions of dollars. Taylor, the other officers of Holly Farms, and the small staff at Memphis maintained operational direction of the many Holly Farms subsidiaries.

Shortly before August 18, 1989, Don Tyson believed that Taylor was not acting in the best interests of Holly Farms in connection with the transition under way as a

---

**2.** *See In re Holly Farms Corporation Shareholders Litigation,* C.A. No. 10350 (Consol.) (Del.Ch., Dec. 30, 1988, 1988 WL 143010; Mar. 22, 1989; May 19, 1989, 1989 WL 60502; June 14, 1989, 564 A.2d 342).

**3.** John Stout, Sr., chairman of the flour milling subsidiary, whose operations were located in Memphis, and an executive vice-president of Holly Farms, remained as a part of the operating group at Memphis.

result of the merger. On August 18, 1989, Holly Farms filed its suit in the Delaware Court of Chancery seeking equitable relief from R. Lee Taylor, II's alleged breaches of fiduciary duties in connection with the stock bonus plan. Holly Farms further sought a declaratory judgment to interpret the dispositive provisions of the stock bonus plan. On August 23, 1989, Taylor filed suit in Tennessee State Court, raising essentially the same issues of interpretation of the stock bonus plan pending in the Delaware state court action.

On the same day suit was filed by Holly Farms in the Delaware Court of Chancery, Taylor and Ted Bailey were notified that their employment by Holly Farms was terminated. The termination of Taylor's employment as chief executive officer sparked the dispute as to the location of the principal place of business of Holly Farms as of August 18, 1989.

The consummation of the merger agreement required the establishment of a parent-subsidiary relationship between Tyson Foods and Holly Farms. Changes in the Holly Farms Board of Directors occurred. All of the former directors, including the defendant Taylor, were ousted in favor of Tyson Foods designees in July of 1989. The new Holly Farms board has acted by written consent but has not held any meetings.

In the two weeks prior to August 31, 1989, Elbert Thomas, Jr., financial vice-president of Holly Farms, was notified he would be terminated as of August 31, 1989. Thomas, as financial vice-president in addition to his other duties, approved all expenditures, authorized checks to be issued and, on August 23, 1989, wrote a letter to Shaw, Pittman, Potts & Trowbridge, Holly Farms' attorneys in Washington, D.C., terminating their services as attorneys for Holly Farms. Second Supplemental Declaration of James B. Blair, Exhibits A & B.

Elbert Thomas, Jr. was terminated as of August 31, 1989, in order to allow him to take advantage of certain severance benefits. However, he was subsequently re-employed and continues to perform duties he was previously performing. *See* Declaration of Gerald Johnston, executive vice-president, finances, Tyson Foods, Inc.

James Thompson, Holly Farms' secretary and treasurer, has remained in those positions at all times since the merger, and on August 31, 1989, was appointed chief executive officer. Thompson, as secretary and treasurer, performed and still performs such tasks as supervising Holly Farms' cash management, managing and administering Holly Farms' insurance contracts and pension plans and overseeing Holly Farms' investor relationships and accounting activities. *See* Supplemental Declaration of James B. Blair, pp. 2–4.

The involvement of Don Tyson and Tyson Foods in the management of Holly Farms and its subsidiaries after the merger agreement is unclear. Don Tyson began to discuss certain business transactions and changes he wanted to make in the operations of Holly Farms and its subsidiaries after completion of the merger agreement. At about the same time, he formed two teams of Tyson Foods executives to conduct inspection tours of various Holly Farms' plants and operations. While Taylor remained chief executive officer of Holly Farms, his duties diminished as Don Tyson's involvement in Holly Farms increased. However, Tyson consulted with Taylor about the Holly Farms businesses generally, and certain proposals Tyson had in mind for changes for Holly Farms by Tyson Foods, Inc. *See* Deposition of Donald Tyson at 27–29, 31, 35–38, 41–42, and 48.

In late June, Taylor had met with Don Tyson at Memphis and Tyson announced his intention to close the Memphis office on July 13, 1989. It became apparent that this could not be done by that date and the closing was postponed to September 1, 1989. Prior to September 1, 1989, it also became apparent that there were some questions as to when the principal place of business of Holly Farms could be moved. There was no space at Springdale, Arkansas, and the move for the present at least was impractical. When the removal of this case from the Delaware court to this Court arose, a final decision was made not to consider

moving Holly Farms' principal place of business. All plans for the departure from Memphis were cancelled. The Court notes that no executive employees of Holly Farms were ever transferred from Memphis to Springdale after the merger agreement.

The Memphis office of Holly Farms traditionally has performed centralized administrative functions and acted as a financial coordinator for tax and regulatory filings of the subsidiaries. The staff at this office historically has assumed the primary responsibilities for compiling financial information for all divisions, preparing filings for the Securities and Exchange Commission (the "SEC"), and preparing the corporate tax returns. Holly Farms' charter, its tax returns, and various filings with the SEC indicate that its principal place of business is Memphis, Tennessee. Also decisions with regard to capital improvement budgets for Holly Farms and all of its subsidiaries were made at the Memphis Office.[4] Holly Farms' corporate records are also located in Memphis, Tennessee. Any person desiring to contact Holly Farms must communicate with the Memphis headquarters. The only telephone number for Holly Farms' headquarters is that for the Memphis office; its telefax number is listed as the Memphis headquarters' telefax machine number. Holly Farms' stationary recites that the Memphis office is the company headquarters. The postal address of Holly Farms is listed as the Memphis location.

## II. DISCUSSION

■ Defendant Taylor is the party who seeks to remove the Delaware state action to this Court pursuant to 28 U.S.C. §§ 1332(a) and 1441(a). As such, Taylor bears the burden of demonstrating that he has met the requirements for removal. *Shiffler v. Equitable Life Assurance Society of the United States,* 609 F.Supp. 832, 837 (E.D.Pa.1985); *Wolgin v. State Mutual*

*Investors,* 442 F.Supp. 974, 978 (E.D.Pa. 1977). *See also* 14A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure 2d* § 3739 and numerous cases cited therein. The right of removal should be strictly construed and a federal court should order remand if there is doubt as to the right of removal. *Steel Valley Authority v. Union Switch and Signal Division,* 809 F.2d 1006, 1010 (3d Cir.1987), *cert. dismissed,* 484 U.S. 1021, 108 S.Ct. 739, 98 L.Ed.2d 756 (1988); *Abels v. State Farm Fire & Casualty Company,* 770 F.2d 26, 29 (3d Cir.1985); *Jones v. General Tire & Rubber Co.,* 541 F.2d 660, 664 (7th Cir.1976). *See also Wolgin,* 442 F.Supp. at 978 (stating that if issue is close or doubtful, party seeking removal has not met his burden and federal court should remand case).

■ Defendant Taylor must persuade this Court that complete diversity of citizenship existed between himself and Holly Farms at the time (i) the Delaware complaint was filed (August 18, 1989), *and* (ii) the petition for removal was filed (August 29, 1989). *Fiorentino v. Huntingside Associates,* 679 F.Supp. 3, 5 (E.D.Pa.1987); *Kerstetter v. Ohio Casualty Insurance Co.,* 496 F.Supp. 1305, 1307 (E.D.Pa.1980). *See also* J. Moore & B. Ringle, 1A *Moore's Federal Practice* ¶ 0.161[1.–3]–267 and cases cited therein.

### A. Defective Pleading

■ Holly Farms argues that Taylor's petition should be denied because *ab initio* the notice of removal fails to plead sufficiently diversity of citizenship, citing, for example, *Kerstetter v. Ohio Casualty Insurance Co.,* 496 F.Supp. 1305, 1307 (E.D. Pa.1980). The Court need not delve deeply into this issue at the present time because if the notice of removal in fact insufficiently pleaded diversity jurisdiction, the Court will grant Taylor leave to amend his notice of removal to cure any defective pleadings.[5] Thus, the Court will not deny Tay-

---

**4.** After the merger agreement, the Holly Farms office in Memphis continued to monitor the capital improvements budgets which were submitted to the Memphis office for decisions. *See*

Excerpts from Deposition of Wayne Britt, one of the new board of Holly Farms, pp. 74–75.

**5.** The Court bases its authority to grant permission to amend upon 28 U.S.C. § 1653, which

lor's petition on this basis, and for purposes of this Opinion, the Court will assume that Taylor's notice of removal adequately pleads diversity jurisdiction between himself and Holly Farms.

### B. Principal Place of Business

A federal district court has "original jurisdiction of all civil actions where the matter in controversy exceeds the sum of $50,000, exclusive of interest and costs, and is between—citizens of different states." 28 U.S.C. § 1332(a)(1). A defendant can remove a "civil action brought in a State court of which the district courts of the United States have original jurisdiction ... to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). With respect to both sections 1332 and 1441, "a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business...." 28 U.S.C. § 1332(c).

The gravamen of Taylor's petition for removal is that the Tyson Foods' acquisition of Holly Farms changed Holly Farms' principal place of business, for purposes of section 1332(a)(1) and (c), from Memphis, Tennessee to Springdale, Arkansas. Taylor claims that this change created complete diversity of citizenship between himself and Holly Farms. An examination of the special circumstances surrounding the Tyson Foods' acquisition of Holly Farms during this transitional period reveals that Taylor's claims must fail.

The leading authority in this Circuit with regard to the "principal place of business" of section 1332(c) is *Kelly v. United States Steel Corp.*, 284 F.2d 850 (3d Cir.1960). In *Kelly*, the United States Court of Appeals for the Third Circuit articulated what has come to be termed the "center of corporate activities" test for locating a corporation's principal place of business.[6] *See Kelly*, 284 F.2d at 853-55. The Third Circuit found the principal place of business to be the location of "the headquarters of day-to-day corporate activity and management". *Id.* at 854. The Court viewed this analysis as "a consideration of the facts of the [corporation's] life." *Id.* at 853. Beyond the center of corporate activity, the Court indicated that certain "secondary factors" warranted consideration. These less important but significant factors included the percentage of employee personnel at the particular location, the amount of corporate property at the location, and the production capacity of the location. *Id.* at 854.[7] The court explicitly rejected any notion that the location of the principal place of business exclusively depended on the location of the board of directors and those who develop the broad corporate policies. *Id.* at 853-54.

The facts in *Kelly*, however, did not involve a parent-subsidiary relationship, but only a single corporation. The Third Circuit subsequently applied the *Kelly* approach to a parent-subsidiary situation in ascertaining the principal place of business of a wholly owned subsidiary. *See Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.*, 461 F.2d 1140, 1143 (3d Cir.1972). *Quaker State* and *Kelly*, therefore, set forth the relevant considerations that this Court should follow in its decision.

While this Court is mindful that the principles of *Quaker State* and *Kelly* provide meaningful guidance, it is equally impor-

---

provides that "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." This statute applies to a technical amendment to a notice of removal even though the 30 day time limit of 28 U.S.C. § 1446(b) has expired. *See Camacho v. Cove Trader, Inc.*, 612 F.Supp. 1190, 1192-93 (E.D.Pa.1985).

**6.** *See, e.g., Topp v. CompAir, Inc.*, 814 F.2d 830, 834 (1st Cir.1987) (describing *Kelly* as "center of corporate activity" test); C. Wright, A. Miller, E. Cooper, *Federal Practice and Procedure 2d*

§ 3625 p. 621 (viewing *Kelly* test as focus on center of corporation's production or service activities).

**7.** *See also Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.*, 461 F.2d 1140, 1143 (3d Cir.1972) (stating that *Kelly* analysis "attaches value to secondary considerations which include where the Board decisions concerning overall corporate functions are reached, and also where a number of the basic corporate functions are maintained (e.g., pension plans, insurance, loans))."

tant to recognize that additional factors are present in this case. Specifically, the record indicates that Holly Farms was in a transitional state after the merger agreement and closing of the tender offer. Deposition of Don Tyson, at 19–30 and 53; Declaration of James B. Blair (General Counsel of Tyson Foods), dated August 31, 1989 (the "Blair I Declaration") at ¶¶ 10, 13, 17–18, 21. Tyson Foods planned to integrate its operations with those of Holly Farms; eventually, Tyson Foods intended to phase out the Memphis office as headquarters of Holly Farms and shift its activities to Springdale, Arkansas. Blair I Declaration at ¶ 17; Declaration of Gerald Johnston (Executive Vice–President of Finance for Tyson Foods) of September 14, 1989 (the "Johnston Declaration") at ¶¶ 4–8; Deposition of Don Tyson at 19–30; Excerpts from the Deposition of Wayne Britt at 47; Deposition of James Thompson at 32–34. But it became clear to those at Tyson Foods and Holly Farms that this hoped for integration would not come easily, and certainly not as quickly as anticipated. Johnston Declaration, at ¶¶ 4–8; Tyson Deposition, at 49, 52–57; Deposition of James Thompson, at 35. The parties have submitted conflicting evidence as to what actually transpired at the Memphis office of Holly Farms during the relevant time period from June 23 to August 18, 1989.

Taylor has cited two cases addressing the issue of the principal place of business of a holding company. Answering Brief for Defendant, at 13. These cases and their appurtenant facts, however, are inapposite to the special circumstances of the present case. In particular, *Douglas v. Ryder Truck Lines*, 597 F.Supp. 1100 (E.D. Pa.1984) concerned a holding company having many subsidiaries, including a subsidiary whose purpose was to implement the policy decisions made by the parent holding company on a day to day basis. *Id.* at 1101. *Bonar, Inc. v. Schottland*, 631 F.Supp. 990 (E.D.Pa.1986) essentially holds

that the relationship between a parent holding company and its subsidiaries should be examined closely to determine the principal place of business of the subsidiary. Consequently, neither of these two cases provides this Court with any additional guidance to decide the present case beyond the broad teachings of *Quaker State* and *Kelly*.

Before addressing the facts of the present case, it is helpful to note the decision of the United States Court of Appeals for the First Circuit in *Topp v. CompAir, Inc.*, 814 F.2d 830 (1st Cir.1987). In this case, the First Circuit confronted the question of the principal place of business of a company having subsidiaries, and in addition, the company had a parent corporation. *Id.* at 831. The Court reversed the district court's view that the location of the parent corporation was the principal place of business of the "offspring" company; the Court felt that this approach overlooked "the separate corporate identity of the corporation whose citizenship is being sought." *Id.* at 835. The Court commented that it is inappropriate to "search out the home of the economic tsar who ultimately dominates, through other corporations or otherwise, the entity in question." *Id.*

This Court is keenly aware that the First Circuit relied upon the so-called "nerve center" test in *Topp*, whereas the Third Circuit, as stated above, has formulated a "center of corporate activity" analysis. The Court cannot state the precise distinctions between these two "tests", but undoubtedly some overlap exists between them.[8] *Topp*, however, is useful insofar as it holds that the location of a parent corporation is not *ipso facto* the location of the principal place of business of the wholly owned subsidiary.

Having extracted the necessary criteria for the analysis from the case precedent, it is now appropriate to apply them to the facts of the present case.[9] Defendant Tay-

---

8. *See Topp,* 814 F.2d at 834 (commenting that the "tests tend often to merge and overlap"); *see also* C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure 2d* § 3625 at 634–35

(noting nerve center test and center of corporate activities tests are similar).

9. At this point, it is also helpful to note the following discussion:

lor's arguments derive largely from the alleged change in his role in the Holly Farms organization after the merger agreement, as opposed to the role of the Memphis office of Holly Farms after the merger agreement. According to Taylor, the Memphis office of Holly Farms "ceased to function as an executive office, for all practical executive purposes, on June 23, 1989 when Tyson assumed control of Holly Farms and was scheduled to be closed in its entirety on September 1, 1989." Affidavit of Taylor of September 8, 1989 (the "Taylor I affidavit"), at ¶ 12. In the Taylor I affidavit, Taylor describes various duties that he performed as chief executive officer prior to the merger. Taylor I affidavit, at ¶ 5. Taylor asserts, however, that he performed none of these activities after June 23, 1989. Taylor I affidavit, at ¶ 7.

The Court does not dispute Taylor's contention that Don Tyson and others wanted to phase out the Memphis office of Holly Farms. It is hard to imagine, however, that an office that had been functioning as the principal place of business for many years *immediately* ceased any meaningful activity after the merger agreement. This contention is especially suspect because the merger agreement did not officially close until July 18, 1989. Blair I Declaration, at ¶ 6.[10] Taylor has pointed to certain decisions of Holly Farms in respect to its subsidiaries and declares that he nor anyone else

in the Memphis office played any part in these decisions. Taylor I affidavit, at ¶ 10. The testimony on this assertion is disputed as it appears that Don Tyson discussed some of these matters with Taylor, and therefore, it is unclear as to what actually transpired.[11]

In his affidavit of September 23, 1989 (the Taylor II affidavit), Taylor refers to a meeting with Don Tyson in which Tyson allegedly mentioned a closing date for the Memphis office, reorganization plans for certain Holly chicken plants, and a meeting in Atlanta of executives of Holly Farms and Tyson Foods. Taylor II affidavit, at ¶¶ 1-2.[12] Taylor claims Tyson failed to consult with him regarding any of these matters. Taylor II affidavit, at ¶ 3. Again, Taylor's statements all tend to focus on the reduction of his role in Holly Farms after the merger. The Court does not view these statements, even if taken as true, as particularly probative.

The evidence submitted by plaintiff Holly Farms indicates that the Memphis office and the executive personnel there performed more than ministerial and meaningless tasks. For instance, although certain executive officers were terminated after the merger agreement, all remaining executive officers of Holly Farms remained in Memphis.[13] Blair I Declaration, ¶ 10. The

[T]he determination of a corporation's principal place of business depends on the facts of each case. No simple test or single element is controlling. Rather, the courts must consider the entire corporation, its purposes, the activities it carries out, and the extent and location of these activities.
*Federal Practice and Procedure 2d* § 3625 at 637.

**10.** According to Mr. Tyson, "Jim [James Blair] and all the group told me I couldn't do anything until the 18th...." Deposition of Tyson, at 53.

**11.** *See* Deposition of Tyson, at 27-31, 35-38, 41-42, and 48.

**12.** Taylor claims that Tyson deliberately excluded him from the meeting in Atlanta. Taylor II Affidavit, at ¶ 2. A review of the Tyson Deposition indicates that counsel for Taylor never questioned Tyson on this point. *See* Tyson Deposition, at 22-24. This Court finds it hard to believe that at the time of this meeting, Taylor was intentionally excluded because at that time Tyson Foods personnel, including Don Tyson,

had no reason to question Taylor's loyalty. Don Tyson, in fact, did not really question Taylor's loyalty until shortly before Taylor's termination. *See* Deposition of Tyson, at 54-56.

**13.** James Thompson continued as secretary and treasurer and did what duties had to be done by himself and the remaining staff. Blair I Declaration, at ¶¶ 19-20. *See generally,* Deposition of James Thompson. Finally, on August 31, 1989, Thompson assumed the functions of chief executive officer of Holly Farms, apparently so that a 10-K form could be filed properly with the SEC. Deposition of James Thompson, at 58-69. Also at the Memphis office was John T. Stout, Sr., an executive vice president of Holly Farms. Blair II Declaration, at ¶ 4. Elbert Thomas, Jr., who was terminated as Financial Vice President of Holly Farms on August 31, 1989, continued to work as a consultant to do essentially the same work as he had done before. Blair II Declaration, at ¶ 2.

record indicates that no Holly Farms executive officers were ever transferred to Springdale. Taylor himself remained in Memphis until his termination on August 18, 1989. Taylor I affidavit, ¶¶ 1 and 11–12. The company's corporate minute books and the minute books of all subsidiaries of Holly Farms were in Memphis during the relevant time period. Blair II Declaration, ¶ 6. Holly's primary assets, the stock certificates of its wholly-owned subsidiaries and a parcel of land, were in Memphis during the relevant time period. *Id.* at ¶ 7. Many important corporate records were in Memphis during this time. *Id.* at ¶ 9. Holly Farms did not alter the location of its bank accounts, 3 out of 4 of which remained in Memphis, after June 23, 1989. *Id.* at ¶ 14.[14] Holly Farms continued to rely upon its own counsel, separate from the counsel of Tyson Foods, after June 23. This counsel, the Shaw Pittman firm, sent Holly Farms invoices and Holly Farms personnel approved payment for these services. *See* Second Supplemental Declaration of James Blair, of September 26, 1989 (the "Blair III declaration").

In sum, what defendant Taylor has shown to this Court is that after the merger agreement of June 23, 1989, there was an intent by Don Tyson and others of Tyson Foods to integrate the functions of Tyson Foods in Springdale, Arkansas with the operations of the Holly Farms office in Memphis and eventually close the Memphis office. Taylor has also demonstrated that his personal role in the operations of Holly Farms diminished after the merger agreement.

The facts that Taylor has established, however, do not indicate that the parent corporation, Tyson Foods, completely assumed command of all of the significant day to day operations of the Memphis office of Holly Farms. Obviously, one would

expect that the Tyson organization would in some way be concerned with running the operations of Holly Farms and its subsidiaries as a result of the acquisition of Holly Farms. That Don Tyson and Tyson Foods would involve themselves in some way in the affairs of Holly Farms, however, is a natural and inevitable result of having bought the company. This action does not per se eliminate the distinct identity of the Memphis office of Holly Farms as the principal place of business.

Taylor has not shown that the Memphis office was displaced as the principal place of business of Holly Farms in the time period between June 23, 1989 and August 18, 1989. The Memphis office was the office out of which all of the activities necessary to be performed by a holding company with a small staff were required to do in the circumstances. The Memphis office continued to function as before—that is, the remaining officers and staff doing what had to be done although certain vice presidents had been terminated. Moreover, the secondary factors mentioned in *Kelly* and *Quaker State* militate against finding that Holly Farms' principal place of business changed after the merger agreement.[15]

In conclusion, the Court holds that defendant Taylor has not carried his burden. The Court does not regard the present case as close—Taylor has fallen far short of meeting his required burden of proof. *See Wolgin,* 442 F.Supp. at 978. Consequently, the Court concludes that on August 18, 1989, the time when the complaint was filed in the Delaware court, there was no diversity of citizenship between Taylor and Holly Farms.[16]

## C. Alter Ego

Taylor argues that Holly Farms' principal place of business changed after

---

**14.** Prior to June 23, 1989, three bank accounts were in Memphis and one was in New York. This situation did not change at any time after June 23, 1989. Blair II Declaration, at ¶ 14.

**15.** For example, as mentioned previously, no executive personnel were transferred from Memphis. Holly Farms' assets and corporate

records stayed in Memphis. *See* Blair II Declaration, at ¶¶ 6–7, 9, 14.

**16.** Because the Court finds that diversity of citizenship did not exist on August 18, 1989, it is not necessary to turn toward the second date of August 29, 1989—the time of filing of the petition for removal.

the merger agreement because Holly Farms then became the alter ego of Tyson Foods. Answering Brief of Defendant of September 7, 1989, at 17 n. 7.[17] Taylor asserts, therefore, that the principal place of business of Holly Farms became indistinguishable from the principal place of business of Tyson Foods. The Court will briefly address this contention.

■ "A subsidiary corporation which is incorporated as a separate entity from its parent corporation is considered to have its own principal place of business...." Moore's Federal Practice, ¶ 0.77[1.–3] 717.-10. If the separation between the parent and subsidiary is carefully maintained, the separate place of business of the subsidiary is recognized in ascertaining jurisdiction, even if the parent corporation may exert substantial control of the subsidiary by ownership or other means. *Quaker State*, 461 F.2d at 1142. *See also Topp*, 814 F.2d at 835–36.

Taylor has not submitted any probative evidence that the legal distinctions between Tyson Foods and Holly Farms were ignored. Holly Farms had its own board of directors, its own executive officers, its own assets such as stock in its subsidiaries and land, and its own recognized identity. *See generally* Blair I and II Declarations. Taylor has not proved that these legal distinctions were altered by the Tyson Foods' acquisition. Unquestionably, Holly Farms still maintained its own corporate identity after the merger agreement. Furthermore, "the fact that a parent corporation exercises the control which is necessarily incident to the full ownership of its subsidiary is insufficient, without more, to justify ignoring the separate corporate entities." *Topp*, 814 F.2d at 837.

The Court finds Taylor's arguments on this point to be without merit and thus no diversity of citizenship existed on August 18, 1989 under this theory.

### D. *Subterfuge*

■ Taylor finally refers to testimony submitted by James Blair of Tyson Foods and argues that he has been improperly denied his right to a federal forum based upon actions taken by Tyson Foods and Holly Farms. Answering Brief for Taylor of September 8, 1989, at 18–20. Taylor specifically points to the Blair I Declaration and statements concerning the closing of the Memphis office of Holly Farms. According to the testimony of Blair in the Blair I Declaration, "Holly had intended to move its headquarters from Memphis to Springdale, Arkansas, where Tyson is based, effective September 1, 1989." Blair I Declaration, at ¶ 13. Upon realizing that Taylor relied upon this action as a basis for removal, this decision was revoked. *Id.* at ¶¶ 13 and 17. In the words of Blair, the Holly Farms Memphis office will remain there if its moving "will jeopardize its right to litigate its case in its chosen forum, the Delaware Court." *Id.* at ¶ 17. On the basis of these statements, Taylor contends that Holly Farms has improperly denied him a right to a federal forum.

Taylor's arguments are not well taken for several reasons. First, the Court has already concluded in parts B and C above that as of August 18, 1989, Taylor had no right to remove the Delaware state action to a federal forum. Any decisions regarding the Memphis office that Tyson Foods and/or Holly Farms may have made after that point, therefore, lose relevance. There could not have been any action by Holly Farms, after the filing of the notice of removal on August 29, 1989, that could have in fact deprived Taylor of a federal forum—because Taylor had no right to a federal forum as of August 18, 1989.

The focus of the Court's analysis so far has been on the location of the principal place of business of Holly Farms on August 18, 1989. Any intentions that Holly Farms may have had at that time pertaining to the possible future location of that

---

17. The status of Taylor's position on this point is unclear. This argument was raised in Taylor's Answering Brief but in a letter from counsel for Taylor to the Court dated September 25, 1989, it was stated that the arguments were not "an assertion of the alter-ego doctrine...." The Court nonetheless will review this contention.

office are of no consequence in the analysis. The analysis turns on the location of the principal place of business on the relevant date, not on the possible future location of the particular office. *Cf. Topp*, 814 F.2d at 839 ("mere intention to locate in New York, without any other corporate activity in furtherance of that intention, has little relevance to the issue of ... [the corporation's] principal place of business as of August 30, 1985"). Taylor's arguments represent an attempt to divert the court from the real crux of the issue.

The Court further notes that although the statements of Blair noted above indicate that the Memphis office remained open beyond September 1, 1989, solely to avoid diversity jurisdiction, the record contains evidence that practical business considerations also played a part in this decision. *See* Johnston Declaration ¶¶ 4–8. It is not the province of the Court to dwell into the motivations and justifications for the decisions that businessmen and businesswomen make on a daily business. These decisions cannot be tempered or clouded by the fear of the federal courthouse.

Finally, the case authority that Taylor has cited in support of his argument is simply far too removed from the facts of the present case. *See* Answering Brief of Defendant, at 17–20. The present case does not involve the creation of a new corporation for the express purpose of destroying diversity jurisdiction, such as occurred in *Douglas Energy v. Mobil Oil Corp.*, 585 F.Supp. 546, 548 (D.Kan.1984). Likewise, the additional cases cited by Taylor on this point can be dismissed summarily as inapplicable to the present case. The present case involves a corporation which had been at a particular location for many years, and chose to remain there. In consequence, this decision does not amount to any sort of "fraud" or "sham" on the diversity statute.

## III. CONCLUSION

The evidence that Taylor has submitted simply has failed to meet the required burden of proof. This leads the Court to conclude that no diversity of citizenship existed between Taylor and Holly Farms on August 18, 1989. Defendant Taylor's petition for removal is denied, and Plaintiff Holly Farms' motion to remand is granted. An order shall be entered accordingly.

Because the Court holds that it has no subject matter jurisdiction of the controversy between Holly Farms and Taylor, defendant Taylor's motion to dismiss and transfer becomes moot.